**In re James M. O'CONNOR & Leora J. O'Connor, Debtors.**

**S.P. INVESTMENTS LIMITED PARTNERSHIP, Plaintiff,**

v.

**James M. O'CONNOR & Leora J. O'Connor, Defendants.**

Bankruptcy No. 91–80206.
Adv. No. 91–8151.

United States Bankruptcy Court, W.D. Michigan.

Sept. 25, 1992.

Dood and Wilson, John J. Dood and Candace L. Wilson, Okemos, Mich., for plaintiff.

Loomis, Ewert, Ederer, Parsley, Davis & Gotting, P.C., Kenneth W. Beall, Lansing, Mich., for defendants.

## OPINION

DAVID E. NIMS, Jr., Bankruptcy Judge.

*Dischargeability Lease as Property Publication*

The Plaintiff filed this adversary proceeding based on 11 U.S.C. § 523(a)(2)(B), asking this court to find that the unpaid balance due under a lease plus other costs are a nondischargeable debt of the Debtors/Defendants, guarantors under the lease.

FACTS

As of 1990, James M. O'Connor (J.O'C.) had been involved in the real estate business for almost 20 years. He and Leora O'Connor (L.O'C.) were married on May 27, 1989. L.O'C. had been employed 11 years at IBM where she was a service support specialist after working as a receptionist and secretary.

In the first part of 1990 or earlier, J.O'C. became interested in obtaining a Re/Max franchise. The company would operate under J.O'C.'s brokerage and the sales people working under that brokerage would pay a set monthly fee for this privilege along with J.O'C.'s assistance and guidance. J.O'C. would pay the rent, overhead and cost of operations. In order to get started as a Re/Max franchisee, it was essential that office space be found and leased.

About this time J.O'C. encountered Robert Homan (Homan), whom he had known before. Homan was then a leasing agent for S.P. Investments Limited Partnership (S.P.I.) of which Farm Meadows Corporation was the general partner. Keith Schroeder was the major stockholder and president of Farm Meadows and a limited partner of S.P.I. In the course of informal discussions, it was disclosed that Homan was leasing office space for S.P.I. and J.O'C. was looking for office space. This initial meeting in the spring of 1990 led to many further conversations and discussions between J.O'C. and Homan. Homan would report to Schroeder the general substance of these discussions and also spoke highly of J.O'C.'s commitment and determination. By July of 1990, J.O'C. had formed Re/Max Calibur Corporation (Re/Max) for the purpose of operating the new business which he was about to commence.

On July 18, 1990, J.O'C. and Homan met at Schroeder's office. Strangely, J.O'C. was at all times in one room, Schroeder in another, and Homan moved between the offices. J.O'C. brought to the meeting a personal financial statement, prepared for Financial Acceptance Corporation (F.A.C.) in acquiring a loan for Re/Max's office furnishings and equipment, and signed by him and his wife on July 3, 1990. J.O'C. testified that he offered to make out a new financial statement for S.P.I. but Homan replied that it wasn't necessary. L.O'C. was not aware that this financial statement was presented to Homan or S.P.I. Homan produced two leases which were prepared by S.P.I. for Re/Max and dated for execution on July 17, 1990. One lease was for a temporary location and the other was for a three year lease on a larger, newer suite of offices which were to be constructed according to Re/Max specifications and ready for occupancy on November 1, 1990. Both leases were then signed by J.O'C. on behalf of Re/Max. Schroeder through Homan informed J.O'C. that he had to have a personal guaranty signed by J.O'C. and his wife. His reason was that he had just recently been through a scenario where a start-up company had leased property from him and then moved out leaving him "holding the bag," and he was determined not to let that

happen again. J.O'C. inquired as to whether it was necessary that L.O'C. sign the guaranty and Homan replied that it was mandatory. Because J.O'C. wanted his attorney to examine the guaranty and L.O'C. was not present, Homan prepared a simple agreement which J.O'C. signed. This agreement read as follows:

MEMORANDUM

DATE: July 18, 1990

TO: SP Investments Limited Partnership

FROM: James M. O'Connor (signed James M. O'Connor)

RE: Suite 350 Hamilton Center

I hereby agree and understand that my wife and I will sign a personal guarantee for the lease entered into between SP Investments Limited Partnership and Re/Max Calibur, dated July 17, 1990, for Suite 350 Hamilton Center.

The memorandum, leases signed by J.O'C. and financial statement were all delivered to Schroeder by Homan.

During the next two weeks negotiations took place as to a proposed written guaranty satisfactory to S.P.I.'s and O'Connors' attorneys. Schroeder obtained a credit report, studied the financial statement, noting in particular the net worth, equity in real estate and cash on hand, and discussed the proposed leasing with his two sons and his attorney.

The O'Connors executed the personal guaranty on July 31, 1990. It is likely that Schroeder signed the leases contemporaneously, although he was unable to testify to the actual date. Schroeder was now satisfied that he had protected S.P.I. He had a recent financial statement showing a net worth of almost $200,000 and cash on hand of $80,000, a written personal guaranty signed by the O'Connors, and was dealing with a man with a good reputation and almost twenty years experience in the real estate business.

However, the financial statement contained many errors. J.O'C. stated that he gave the F.A.C. statement to Homan knowing that the figures were not right. Although at first he indicated that he told Homan twice that there had been changes in the form, when pressed, he admitted that he had never sat down with Homan or Schroeder and said that these numbers are not correct.

Just prior to the signing of the F.A.C. financial statement, J.O'C. obtained $75,000 from certain lines of credit and deposited it in an account for the sole purpose of showing it on his financial statement under the asset column as cash on hand without listing it as a liability. His explanation was that since he was just putting it in and would pay it back after he made out his financial statement he saw no necessity of showing the loan as a debt. A loan officer of F.A.C. suggested this ploy, according to J.O'C., in order for Re/Max to obtain a $90,000 line of credit with F.A.C. and J.O'C. thought it was proper. The same misleading statement was given S.P.I. as the O'Connors' financial statement. J.O'C. admitted that he failed to show taxes due on real estate, explaining that it never crossed his mind that he should include taxes on the statement because his certified public accountant told him not to pay them off since they could be paid when the property was sold. The stated real estate income for 1989 was partly based on a lease that never materialized.

Just before November 1, 1990, the commencement date on the lease for the permanent space, the O'Connors visited with Schroeder and told him that things were not going well and they needed some help. He stated that he would consider some options, he also suggested that they talk to Homan. While Schroeder was spinning his wheels trying to figure out what he could do, J.O'C. without further notice moved into the permanent space during the first week of November. At this time there was no occupancy permit.

Schroeder described the delay until January, 1991 in acquiring the permit as bureaucratic. Various inspections which must be made in a specific order are required for the occupancy permit, but the independent inspectors set their own schedules. Schroeder testified that the space

passed all inspections and on other occasions lessees had moved in prior to obtaining a permit. In the case of the O'Connors, he was surprised that they had proceeded to move in after the discussion of their problems only a few days before.

L.O'C. testified that it was their hope that by December they would have six or seven agents and this would pay their overhead. However, by December J.O'C.'s health was deteriorating and they had only one agent whose negative personality was not helping draw other people to the business. Monies were going out faster than anticipated. They decided to close the business and try to pay everybody rather than attempting to continue, concluding that fewer people would get hurt this way. On or about December 15, 1990, Re/Max moved out of the leased premises. J.O'C was hospitalized by the end of December and required approximately three months to recover. L.O'C. wrote a letter at the end of December stating that they left the property because of code violations. The only problem expounded upon during the trial was regarding the lack of a fire door, an issue which arose when they had gotten locked in the building and couldn't get out without their keys which they had given to their secretary for the purpose of making duplicates.

On January 14, 1991, James M. O'Connor and Leora J. O'Connor filed a joint bankruptcy petition for relief under chapter 7 and on June 19, 1991 received a discharge of all of their dischargeable debts.

## JURISDICTION

This court has jurisdiction over this adversary proceeding by 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and W.D.Mich.L.R. 57.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## BURDEN OF PROOF

The standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). I have applied that standard in determining the issue of dischargeability in this proceeding.

## DISCUSSION

1. *Debtors' liability resulting from guaranty.*

The O'Connors assert that they never received any consideration for the personal guaranty because the leases were already in existence when the guaranty was signed and without consideration for the guaranty, they are not personally liable for the debt to S.P.I. I do not agree. All of the actions of the parties up to July 31, 1990, were part of the execution of the leases as agreed upon by the parties. This included the furnishing of the personal financial statement by J.O'C., the signing of the guaranty by the O'Connors, the examination of the financial statement and the signing of the leases by the lessor.

The O'Connors refer to *Moses v. National Bank of Lawrence County*, 149 U.S. 298, 13 S.Ct. 900, 37 L.Ed. 743 (1893), for the proposition that a guaranty, given after the underlying documents have been delivered and taken effect (in the case at bar, the leases), requires distinct consideration to support it or else the guaranty is void.

*Moses* is clearly distinguishable. Re/Max did not receive copies of the leases signed by Schroeder until the O'Connors provided a signed guaranty. That guaranty states that the consideration for the guaranty was the execution and delivery of the leases dated July 17, 1990. In addition, J.O'C. signed a "Memorandum" dated July 18, 1990 in which J.O'C. agreed that he and his wife would sign a personal guarantee for the lease.

Schroeder required a personal guaranty by both J.O'C. and L.O'C. before he provided them signed leases. Once the O'Connors signed the guaranty and gave it to S.P.I., they became personally liable for the damages suffered by S.P.I. as a result of Re/Max's breaking the lease. The guaranty itself does not make the debt nondischargeable as all of the requirements under § 523(a)(2)(B) must be met, but this is a debt of the O'Connors under § 523(a).

2. *Was the lease "property" within 11 U.S.C. § 523(a)(2)?*

This proceeding was taken under advisement for determination of whether

or not a lease agreement constitutes property under 11 U.S.C. § 523(a)(2)(B). 11 U.S.C. § 523(a) provides in pertinent part:

(a) A discharge under section 727 * * of this title does not discharge an individual debtor from any debt—

.  .  .  .  .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

.  .  .  .  .

(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive;

The court was concerned over the impact of *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915), in which the Court used a very strict interpretation of the term property. *Gleason* was decided under § 17a of the 1898 Act which did not list liability for services as § 523(a)(2) does. The issue before the Court was whether services of an attorney fit within the term "property" so the debt could be excepted from discharge. Attorney Gleason, relying on Thaw's representation that he had a $500,000 interest in his father's estate and a $30,000 a year income, provided over $60,000 in services in defending Thaw on an indictment for murder. In a suit for fees by Gleason claiming false representation by Thaw, Thaw used the defense of discharge in bankruptcy. Hence, the question of whether this debt for services was excepted from discharge as property under § 17a arose. The Supreme Court, holding that they didn't believe Congress intended professional services to be included in "property," went on to state:

In view of the well-known purposes of the bankrupt law, exceptions to the operation of a discharge thereunder should be confined to those plainly expressed; and while much might be said in favor of extending these to liabilities incurred for services obtained by fraud, the language of the act does not go so far.

*Id.* at 562, 35 S.Ct. at 289.

*Gleason* seems to be clear, but a few years later the same Court in deciding *Fidelity & Deposit Co. of Maryland v. Arenz*, 290 U.S. 66, 54 S.Ct. 16, 78 L.Ed. 176 (1933), described *Gleason* as a close case which could not reasonably be extended to *Arenz*. Fidelity, a surety for Arenz, was required to pay out under Arenz' bond. Arenz attempted to discharge his debt to Fidelity in bankruptcy but Fidelity argued the debt was excepted from discharge because the bond was property acquired by means of a materially false written statement. The Court held:

"Property" is a word of very broad meaning, and, when used without qualification, expressly made or plainly implied, it reasonably may be construed to include obligations, rights, and other intangibles as well as physical things. (citations omitted) For the meaning rightly here to be given the word, regard is to be had to the statute and connection in which it is found. (citations omitted) The Act, while making discharge of bankrupts the general rule, conditions the grant upon adherence by every applicant to the standards of honesty and fair dealing in business transactions that are required or reflected in section 32(b)(1), (2), (3), (4), (6), (7), 11 USCA. The fraud perpetrated by respondent is of the kind condemned. Giving effect to the rule that legislative intent controls, it is plain that "property" includes petitioner's obligation according to the terms of the bond to pay respondent's debts. (citations omitted)

*Id.* at 68–69, 54 S.Ct. at 17–18. The Court seemed to almost be indicating that maybe it was wrong in *Gleason*, or in the very least, has limited its application.

In various cases subsequent to *Gleason* and *Arenz*, courts have looked at the use of the word "property" and given it a broad definition. In *Superior Bath House Co. v. McCarroll*, 312 U.S. 176, 61 S.Ct. 503, 85

L.Ed. 721 (1941), the Supreme Court reviewed the meaning of the word "property" in a tax case where it held that, "[T]he word property is by no means limited, in all its variations, to actual tangible physical things. Its meaning must be determined from its context as illumined by the subject treated and the objectives sought." *Id.* at 179–180, 61 S.Ct. at 505.

In *Tri–Lakes S.S. Co. v. Commissioner of Internal Revenue,* 146 F.2d 970 (6th Cir.1945) the Sixth Circuit also looked at the definition of "property" in the context of a tax case and held:

> It is axiomatic that the words of a statute are to be read in their natural and ordinary sense, unless some strong reason to the contrary appears. *Miller v. Robertson,* 266 U.S. 243, 45 S.Ct. 73, 69 L.Ed. 265 [ (1924) ]. Considering the natural and ordinary connotation of the term "property," there is no doubt that it is one of broad application, sufficiently comprehensive to include both tangible and intangible property, and so, money. (citations omitted) *Fidelity & Deposit Co. v. Arenz,* 290 U.S. 66, 54 S.Ct. 16, 78 L.Ed. 176 [ (1933) ].

*Id.* at 972. Thus, our circuit has also adopted a broad definition of "property."

Since *Gleason* it seems that courts have continued to hold that it is Congress' intent to put limits on the fresh start emphasized by *Gleason.* For example, in *United States v. Sotelo,* 436 U.S. 268, 98 S.Ct. 1795, 56 L.Ed.2d 275 (1978), Sotelo was found personally liable to the government for his failure to pay over taxes withheld from employees of the corporation in which he was the principal officer, and that debt was found to be nondischargeable. Sotelo argued that the withheld taxes were the obligation of the corporation and that § 172 of the Bankruptcy Act[1] made certain *taxes* nondischargeable but 26 U.S.C. § 6672 defined the withholding liability as a "penalty." The Court found that the provision of § 172 which modifies "taxes" by the phrase "collected or withheld from others" was added to respond to the Treasury Department's position that any discharge of liability for collected withholding taxes, including the liability of persons other than employers, was undesirable. The Court reversed the court of appeals, explaining:

> In light of this legislative history, little doubt remains as to the nondischargeability of respondent's liability under § 17a(1)(e). The Court of Appeals did not consider this history, but instead relied on more general policy factors. The court observed that an "inequit[y]" could arise from holding an individual "liable for a tax owed by a corporation" in cases where, because "[t]he corporate liability ... vastly exceed[s] the individual's present or future resources," his "entire future earnings could be confiscated to compensate for the corporate liability." Such a result, in the court's view, "would contravene the Bankruptcy Act's basic policy of settling a bankrupt's past debts and providing a fresh economic start." [*In the Matter of Sotelo*] 551 F.2d [1090], at 1092–1093 [ (7th Cir.1977) ].
>
> However persuasive these considerations might be in a legislative forum, we as judges cannot override the specific policy judgments made by Congress in enacting the statutory provisions with which we are here concerned. The decision to hold an individual "liable for a tax owed by a corporation," even if there is a wide disparity between the corporation's liability and the individual's resources, was made when Internal Revenue Code § 6672 was passed, since it is that section which imposes the liability without regard for the individual's ability to pay. And while it is true that a finding of nondischargeability prevents a bankrupt from getting an entirely "fresh start," this observation provides little assistance in construing a section expressly designed to make some debts nondischargeable. We are not here concerned with the entire Act's policy, but rather with what Congress intended in § 17a(1) and its subdivision (e).

*Id.* 436 U.S. at 279–280, 98 S.Ct. at 1802. Thus, it is clear that the early concern of the Supreme Court for the right to a fresh

---

1. Now 11 U.S.C. § 523(a)(1).

start as expressed in *Gleason,* has been gradually diluted as other concerns replaced the former priority.

I requested briefs on the issue of whether a lease can be property within the meaning of 11 U.S.C. § 523(a)(2). Neither counsel or the court found many cases in point. The only lease case above the bankruptcy court level was *Telco Leasing, Inc. v. Patch (In re Patch),* 24 B.R. 563 (D.Md. 1982). Here Telco entered into an equipment lease with P.H.S. and Patch personally guaranteed the lease. The bankruptcy court held that reliance by the lessor on Patch's financial statement was unreasonable. The district court reversed and remanded for further proceedings. Apparently both the bankruptcy and district courts assumed without question that a lease was property.

In *Walter E. Heller & Co. v. Byrd (In re Byrd),* 41 B.R. 555 (Bankr.E.D.Tenn.1984), the court held that a corporate debt for the lease of a computer, guaranteed by Byrd, was a nondischargeable debt of Byrd's because he had given the lessor a personal financial statement which was materially false. Again, the issue of whether a lease constitutes property was not addressed. *See also Lowell Holding Corp. v. Granovetter (In re Granovetter),* 29 B.R. 631 (Bankr.E.D.N.Y.1983).

The only case the court found which discussed whether a lease is property under 11 U.S.C. § 523(a)(2) is *Barwick v. Brewer (In re Brewer),* 66 B.R. 214 (Bankr. S.D.N.Y.1986). Barwick had leased to Brewer a large 150 year old home in Bedford, N.Y. for a private residence and corporate office. When Brewer filed chapter 7 bankruptcy, Barwick filed a claim for unpaid rent and damages. The court found that the written financial information submitted to Barwick was "materially false and deceptive" and Barwick reasonably relied upon that information. Judge Schwartzberg also had some problems with the fact that a lease was involved but he held the claim of the plaintiff was nondischargeable, stating:

> Very rarely does a court encounter a situation where a lessor claims reliance

on materially false statements in writing with respect to the financial ability of a prospective lessee to perform under the terms and conditions of a lease for residential property. This is not usually regarded as a credit transaction because the lessee does not get to keep the property. The title to the property continues to be held by the lessor. However, this is a credit transaction to the extent that the lessee is obligated to pay for the right of possession which is transferred in exchange for the lessee's obligation to pay rent. When a lessor of residential property seeks proof of the financial condition of a prospective lessee as a condition precedent to leasing the property to the prospective lessee, such lessor is generally entitled to rely on the submitted documentation and to assume that the prospective lessee will submit truthful information. The lessee's right of possession under the lease is a property right which may be transferred or withheld depending on the creditworthiness of the lessee. Thus, the lessee obtains a valuable property right from the lessor in exchange for the lessee's obligation to make payments in accordance with the terms of the lease. A debt for this property right may be held to be nondischargeable if incurred through fraud and deceit under conditions described in 11 U.S.C. § 523(a)(2)(B). As defined by the Supreme Court:

> [Property] denotes something subject to ownership, transfer, or exclusive possession and enjoyment, which may be brought within the dominion and control of a court through some recognized process.

*Gleason v. Thaw,* 236 U.S. 558, 561, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915). Thus, a party who leases property to a debtor is entitled to look to 11 U.S.C. § 523(a)(2) if the lessee obtains the property under conditions proscribed in 11 U.S.C. § 523.

*Id.* at 217.

There are few cases which have addressed whether a lease is property for purposes of 11 U.S.C. § 523(a)(2)(B). Since neither counsel nor the court have discover-

ed a case holding that a lease is not property, I find that the O'Connors' debt for the breach of the lease is a debt for property and is not discharged under § 727 if the requisite elements under § 523(a)(2)(B) are proved.

### 3. *Did the O'Connors receive a benefit from the lease?*

■ The O'Connors claimed that they did not benefit by the lease between S.P.I. and Re/Max. I cannot agree.

The issue of whether a benefit was received arises from the language "to the extent obtained by" in § 523(a)(2). Our district court in *McHenry v. Ward (In re Ward)*, 115 B.R. 532, 538 (W.D.Mich.1990), adopted the reasoning of *Simmons v. Wade (In re Wade)*, 43 B.R. 976 (Bankr. D.Colo.1984). *Wade* espoused the "receipt of benefits" theory from *Hyland v. Fink*, 178 N.Y.S. 114, 115 (1919), which explained: "If it is shown that the bankrupt derives a benefit from the property obtained he comes within the provisions of the statute in question, which by its very terms places no limitations as to whom the property is obtained for." *Wade* at 981.

The O'Connors did receive a benefit even though the property, the lease, was not obtained for themselves, but rather for Re/Max. J.O'C. was the sole shareholder and president of Re/Max. His future income depended upon the profitability of Re/Max and therefore he received a benefit from entering into the lease. L.O'C. also benefitted from the lease as J.O'C.'s wife. *See also Bates v. Winfree (In re Winfree)*, 34 B.R. 879 (Bankr.M.D.Tenn.1983), (benefit obtained by debtor who was a shareholder, officer and director of the corporation that obtained the loan) and *Century First Nat'l Bank of Pinellas County v. Holwerda (In re Holwerda)*, 29 B.R. 486 (Bankr.M.D.Fla. 1983), (benefit obtained by debtor who was a principal of the corporation which received the loan).

### 4. *Was the Debtors' financial statement materially false?*

■ As is easily gleaned from the statement of facts, without question the finan-cial statement of the O'Connors was materially false. The entry on the financial statement of approximately $75,000 more cash on hand than actually existed, the result of a scheme concocted by J.O'C. and an employee of F.A.C., greatly distorted the net worth of the O'Connors. Other errors on the statement were the omission of real estate taxes due and the inclusion of real estate income which never existed. These incorrect entries are more than sufficient to conclude that the financial statement was materially false.

### 5. *Reasonable reliance.*

■ O'Connors maintain that Schroeder did not reasonable rely since he did not take the precautions that a prudent landlord would take entering into a lease. They cite *Manufacturer's Hanover Trust Co. v. Ward (In re Ward)*, 857 F.2d 1082 (6th Cir.1988). Ward, the debtor, received an application from Manufacturer's Hanover Trust Company's (MHT) nationwide direct mail credit card solicitation. He filled it out and received his credit card with a pre-approved credit limit of $2,000. During a 23 day period, Ward charged $2,200 to this account. The court found that MHT requested no financial statement from Ward and conducted no credit check of his financial responsibility which would have disclosed 12 other credit accounts together with an embezzlement conviction ordering a restitution of $250,000. Quoting *In re Carpenter*, 53 B.R. 724, 729 (Bankr. N.D.Ga.1985), the sixth circuit, granting a discharge, held, "[W]hen a credit card company issues a credit card with no credit check of the applicant it has made a calculated business decision to assume the risk of nonpayment."

The *Ward* case is substantially different than the *O'Connor* case. S.P.I. did not make a calculated business decision to assume risk of nonpayment, but rather investigated the O'Connors to avoid the dangers of accepting a new corporation such as Re/Max as a tenant. Schroeder made a credit check and required a financial statement and personal guaranty from the O'Connors. Here, instead of having a

large financial institution lending to a randomly chosen consumer, is a businessman who, before entering into a commercial lease with a reputable real estate broker, made considerable inquiry into the broker's financial condition. While it was obvious the financial statement was not prepared by an accountant and dealt only in round figures, it did indicate that the O'Connors had a relatively high net worth and sufficient cash on hand.

The testimony of Schroeder and Homan disclosed that S.P.I. heavily relied on the financial statement. I find that the reliance was reasonable.

### 6. *Publication with intent to deceive.*

One of the necessary elements to except a debt from discharge under 11 U.S.C. § 523(a)(2)(B), is that the debtor caused the financial statement to be published with intent to deceive. The first consideration hereunder is whether there was publication.

The intended meaning of "published" is illustrated in the Senate Report where it equates the meaning to that in a defamation case, S.Rep. No. 989, 95th Cong., 2d Sess. 77–79 (1978), and in the House Report where it analogizes the meaning to that in slander actions, H.R.Rep. No. 595, 95th Cong., 1st Sess. 363 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. American Jurisprudence explains, "Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." 50 Am. Jur.2d *Libel and Slander* § 146.

■ J.O'C. gave a copy of the credit report, originally submitted to F.A.C., to Homan for delivery to Schroeder. Once Schroeder received the statement, the act of publishing as to J.O'C. was completed.

■ As for L.O'C., we have an entirely different situation. L.O'C. testified that she wasn't aware that the F.A.C. financial statement was given to S.P.I., and I find that testimony credible. She signed the statement (without reviewing it) so that it could be sent to F.A.C. who was about to give Re/Max a furniture and equipment loan. L.O'C.'s signature represented to F.A.C. that the statement was true, however this is not an action by F.A.C. She was never told nor did she intend that it would be used to obtain the lease from S.P.I.

Collier comments that:

The statement need not be made directly to the creditor or the creditor's representative in order for the debt to fall within the exception to discharge. It is sufficient if the creditor learns of the false statement indirectly provided there is reliance thereon. Hence, a false statement made to a mercantile agency for general use is unquestionably a basis for excepting the debt from discharge.

3 Lawrence P. King, et. al., Collier on Bankruptcy ¶ 523.09[5][a] (15th ed. 1922). All of the citations regarding the above discussion reference cases where the debtor sent financial information to places such as credit rating firms whose very purpose is to publish that information to potential creditors of the debtor.

Unquestionably, L.O'C.'s publication to F.A.C. is not comparable to publication to a credit agency. She did not publish to S.P.I. by publishing to F.A.C. In addition, L.O'C. cannot be held to have published through the acts of J.O'C.

In *Bancboston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556 (6th Cir.1992), the court held that under § 523(a)(2)(A) the fraud of one general partner was imputed to another general partner who had no actual knowledge of the fraud. L.O'C. was not a partner of J.O'C. Re/Max was a corporation in which she was not active as an officer. While she potentially could have become more involved in the future, during the formation and setup of Re/Max L.O'C. continued a full time job at IBM. *Ledford* is not applicable to this case.

By signing the personal guaranty, L.O'C. became responsible for any debt incurred by Re/Max. However, S.P.I. has not proved by a preponderance of the evidence that L.O'C. published the false financial statement to S.P.I. or that she ever intended to so publish.

Next, I must determine whether J.O'C.'s publication was made with the intent to deceive. J.O'C. testified that he told Homan on a couple of occasions that there had been changes to the financial statement. Nevertheless he did not disclose the magnitude of the misrepresentations he made in the financial statement. J.O'C. needed S.P.I. to rely on the entries which were not true, the cash on hand, equity in real estate, and income from real estate because those figures significantly exaggerated the O'Connors' net worth. The standard for this court is to find that J.O'C. either intended to deceive S.P.I. or acted with gross recklessness. *See Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1167 (6th Cir.1985). I hold by a preponderance of the evidence that J.O'C. intended to deceive S.P.I. Even if J.O'C. notified Homan of "changes," J.O'C. acted with gross recklessness when he didn't reveal the extent to which the statement overvalued his net worth.

### 7. *Defense of lack of occupancy permit.*

It is the claim of O'Connors that the lease was void as a matter of public policy for failure by S.P.I. to obtain an occupancy permit at the time that they moved into the premises. The court is satisfied from the preponderance of the evidence that the absence of an occupancy permit had nothing to do with their moving out. J.O'C. and L.O'C. had asked for some relief on the lease and, a few days later while Schroeder was considering some options, Re/Max moved in. L.O'C. testified that their financial problems, which they discussed with Schroeder on November 1, 1990, had not improved by December. The six or seven agents they required to make the Re/Max plan work had not materialized. J.O'C.'s health was bad in early December and he was hospitalized by the end of the month. The court is satisfied by a preponderance of the evidence that by December J.O'C. had many serious problems, but the lack of an occupancy permit was not one of them. Though L.O'C.'s letter complained of the lack of the occupancy permit, Re/Max had vacated the property approximately two weeks prior to the letter. The only complaint, getting locked in the private office, was a minor problem and had no bearing on the decision to vacate the property. The court can find no evidence that there was any discussion with the landlord regarding any deficiencies except for the locked door.

### 8. *Damages.*

Having found the claim of S.P.I. to be nondischargeable as to J.O'C., I must determine the amount of damages caused S.P.I. by reliance on the false financial statement. It was the duty of the landlord to mitigate his damages. I find no proofs that the landlord failed to re-rent the premises as soon as he reasonably could. The premises had been specially constructed according to the unique needs of the tenant. S.P.I. did do all that a reasonable person could do under the circumstances to mitigate damages.

The S.P.I. attorneys have been helpful in suggesting a method of determining damages. I accept the figures of exhibit 5 in part. Certainly a good start is the total rent to be paid over the entire three year period which is $99,086.28. From this amount there should be deducted the deposit and two rental payments which amount to $7,935, leaving the unpaid rent at $91,151.28. Mitigation would include rents paid or to be paid by the new tenants of $61,562.41 from which there should be deducted $13,252.47 for the cost of construction to meet the needs of the new tenants for a net mitigation of $48,309.94. Thus the net loss of rent would be $42,841.34. I have not added the landlord's cost of financing as requested by the Plaintiff since that is one of the many expenses a landlord uses in determining total rent.

To the above figure, there should be added interest at the current federal rate from the time of filing the adversary proceeding, April 15, 1991, until the date of entry of this judgment. *See Payne v. Brace (In re Brace)*, 131 B.R. 612 (Bankr. W.D.Mich.1991). The present rate is 3.41%. This would add $2,228.45 to the damages for a total of $45,069.79.

■ However, the damages as above calculated must be reduced to present value. "It is settled law in this Circuit that an award of future damages must be reduced to present value in order to take into account the earning power of the money." *Rodgers v. Fisher Body Div., General Motors Corp.*, 739 F.2d 1102, 1106 (6th Cir. 1984). *But see Broan Mfg. Co. v. Associated Distributors, Inc.*, 932 F.2d 1146 (6th Cir.1991), (failure to instruct on reduction of future damages to present value in trademark infringement case when not requested was not plain error); *Walker v. Consumers Power Co.*, 824 F.2d 499 (6th Cir.1987), (trial court in wrongful termination suit should consider instructing on discounting damages to present value or put parties' stipulation to trade off discount factor for inflation factor on the record); *Kokesh v. American Steamship Co.*, 747 F.2d 1092 (6th Cir.1984), (declined to apply *Rodgers* award of damages for personal injury, noting a Supreme Court case which refused to adopt an exclusive method but suggested one option of assuming that the market rate of interest is exactly offset by price inflation and productivity gains).

This court holds that it is appropriate under the facts of this case to use a discount rate. The Plaintiff has asked for a judgment for the total amount due under the lease plus interest even though all the payments have not yet become due. Also, there is no reason to assume an offset of the discount of future damages to present value. The future damages will not vary due to any factors because the amount was set by the terms of the lease.

■ While many cases discuss reducing damages to present value, they do not present a clear formula to accomplish it. A sensible instruction is contained in *Pattern Jury Instructions, Civil Cases*, ¶ 15.3 (5th Cir.1992):

If you award damages for loss of future earnings, you must consider two particular factors:

1. You should reduce any award by the amount of the expenses that the plaintiff would have incurred in making those earnings.

2. If you make an award for future loss of earnings, you must reduce it to present value by considering the interest that the plaintiff could earn on the amount of the award if he made a relatively risk-free investment. The reason why you must make this reduction is because an award of an amount representing future loss of earnings is more valuable to the plaintiff if he receives it today than if he received it in the future, when he would otherwise have earned it. It is more valuable because the plaintiff can earn interest on it for the period of time between the date of the award and the date he would have earned the money. Thus you should adjust the amount of any award for future loss of earnings by the amount of interest that the plaintiff can earn on that amount in the future.

An even clearer instruction is *1 Mich. Std. Jury Instr.*, 2d ed. § 53.03:

If you decide plaintiff will sustain damages in the future, you must reduce that amount to its present cash value. The amount of damages you determine [he/she] will sustain the first year is to be divided by 1.05. The amount of damages you determine [he/she] will sustain the second year is to be divided by 1.10. The amount [he/she] will sustain the third year is to be divided by 1.15. You then continue to use a similar procedure for each additional year you determine [he/she] will sustain damages. The total of your yearly computations is the present cash value of plaintiff's future damages.

Since the purpose of the discount rate is to reduce for what could be obtained in "relatively risk-free investment", I have taken the federal rate and applied it to future damages in the manner used in the Michigan Instructions. That gives me the figure of $649.02. Thus the adjusted amount of damages is $44,420.77. This judgment will carry interest at the rate of 3.41% from the date of judgment. 28 U.S.C. § 1961(a). Costs may be taxed.

## CONCLUSION

1. This court has jurisdiction over the proceedings.

2. There was ample consideration for the execution of the personal guaranty by the O'Connors.

3. For the purpose of this proceeding, the lease was property as intended by Congress in 11 U.S.C. § 523(a)(2)(B).

4. The O'Connors received a benefit from the office lease.

5. The financial statement given to S.P.I. was in writing, and materially false respecting the O'Connors' financial condition.

6. S.P.I., the creditor to whom O'Connors are liable for property or credit, reasonably relied upon the financial statement.

7. J.O'C. caused the said financial statement to be published with intent to deceive. Plaintiffs have not proved by a preponderance of the evidence that L.O'C. caused said financial statement to be published with intent to deceive.

8. The failure to obtain an occupancy permit was a minor matter, easily corrected, and was not a reason for the vacating of the premises.

9. The Plaintiff has proved its case against J.O'C. by a preponderance of the evidence. S.P.I. has not proved its case against L.O'C. by a preponderance of the evidence.

10. The Plaintiff made every reasonable effort to mitigate damages.

11. Total damages suffered by S.P.I. because of the breach of lease by J.O'C. are $44,420.77.

12. The discharge of L.O'C. under 11 U.S.C. § 727 does discharge her from any debt owed to Plaintiff.

13. The discharge of J.O'C. under 11 U.S.C. § 727 does not discharge him from this debt owed to Plaintiff.

14. The complaint in this proceeding is dismissed with prejudice as to L.O'C.

## ORDER

This court, having received a complaint from S.P. Investments Limited Partnership, having conducted a two day trial, having obtained post-trial briefs, and having entered its opinion this date which is hereby incorporated in and made a part hereof by reference thereto;

NOW THEREFORE, ORDERS AS FOLLOWS:

1. The Plaintiff's complaint against Leora J. O'Connor is dismissed with prejudice.

2. A judgment may be entered against James M. O'Connor in the amount of $44,420.77.