**In the Matter of Janet Carter GORDON, Debtor.**

**Agribank, FCB, as Assignee of American Express Centurion Bank c/o AgSmart, Plaintiff,**

**v.**

**Janet Carter Gordon, Defendant.**

**Bankruptcy No. 00–52694 RFH.**
**Adversary No. 00–5145.**

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

June 5, 2003.

818

John T. McGoldrick, Jr., Michael N. White, Macon, GA, for Plaintiff.

Wesley J. Boyer, Macon, GA, for Defendant.

## MEMORANDUM OPINION IN RESPONSE TO REMAND FROM DISTRICT COURT

ROBERT F. HERSHNER, Jr., Chief Judge.

This Court published its memorandum opinion and entered an order in this adversary proceeding on June 13, 2001.[1] The United States District Court for the Middle District of Georgia entered on September 18, 2002, an order that affirmed in part and remanded in part with instructions for further proceedings.[2] This Court invited counsel to submit briefs on the issue on remand. The Court, having considered the record and the briefs of counsel, now publishes this memorandum opinion.

The issue on remand is whether an intent to deceive may be imputed through agency law to Janet Carter Gordon, Defendant.

---

**1.** *Agribank, FCB v. Gordon (In re Gordon)*, 277 B.R. 796 (Bankr.M.D.Ga.2001).

**2.** *Agribank, FCB v. Gordon*, 5:01–CV–374–4 (DF) (M.D.Ga. Sept. 18, 2002).

This Court published its findings of fact in a memorandum opinion dated June 13, 2001.[3] A summary of the facts relevant to the issue on remand shows that Defendant and George T. Gordon were married in 1973. Mr. Gordon began farming in 1973. Defendant helped with chores on the farm. The Gordons have farmed the same land since 1973. After several years of marriage, Defendant obtained a college degree and became a full-time teacher. She has continued to help with chores on the farm.

In 1997, Mr. Gordon filed a bankruptcy petition as a "family farmer" under Chapter 12 of the Bankruptcy Code. Defendant was not a debtor in the Chapter 12 bankruptcy proceeding.[4] In 1998, Mr. Gordon needed additional funds to continue farming. Mr. Gordon, on February 25, 1998, was socializing at a farm supply store in Rochelle, Georgia. The store is part of a national chain known as Terra International, Inc. Richard Rhodes was the general manager of the store. Mr. Rhodes told Mr. Gordon about a new financing program for farmers called AgSmart. Mr. Rhodes represented that AgSmart was a simple loan process that operated similar to a credit card account.

Agribank, FCB, Plaintiff, is a Farm Credit Bank and is part of the national farm credit system. Plaintiff developed the AgSmart program to provide operating loans to qualified farmers. The AgSmart loan process is designed to advise an applicant within a couple of hours whether a loan will be approved.

In their conversation, Mr. Gordon observed to Mr. Rhodes that it would not do any good for him to fill out an application because he was in Chapter 12 bankruptcy.

Mr. Rhodes suggested to Mr. Gordon that he could apply for the loan in his wife's name. Defendant was teaching school that day. Mr. Gordon telephoned Defendant and told her about AgSmart. Defendant told her husband to apply for the loan. Defendant authorized her husband to sign her name to the loan application. Defendant understood that her financial information would be reviewed. Defendant testified that she gave no instructions to her husband as to what information to put on the loan application. Defendant testified that she and her husband had been married for twenty-seven years and that she had no reason to suspect that her husband would misstate any information.

Mr. Gordon and Mr. Rhodes completed an AgSmart Operating Loan Application, which was dated February 25, 1998. The applicant is shown as Janet C. Gordon. Mr. Gordon signed Defendant's name to the loan application. All the information on the application, except for Defendant's street address, was handwritten by Mr. Rhodes. Mr. Gordon did not object to any of the information that Mr. Rhodes wrote on the application. The loan application requested $70,000 to purchase chemicals and fertilizer.[5]

Plaintiff had no prior business dealings with Defendant. Plaintiff did not contact Defendant to verify any information on the application. Defendant did not see the completed loan application. Defendant did not personally provide any of the information on the application. Defendant concedes that her gross agricultural income and total assets were misstated.

---

3. The Court will note additional findings of fact not contained in its memorandum opinion dated June 13, 2001, as "Additional Finding of Fact, Tr. p. ——." Tr. refers to the trial transcript.

4. Additional Finding of Fact, Tr. p. 15.

5. Additional Finding of Fact, Plaintiff's Exhibit 1.

Defendant has helped with chores on the farm since 1973. The loan application shows that Defendant began farming in 1977. Mr. Gordon does most of the actual farming. Defendant testified that she is a farmer and a full-time teacher. Defendant also testified that she did not farm in 1997. Defendant testified that her husband did the farming in 1997.[6] Mr. Gordon was shown as the proprietor of the farm on the Gordons' joint federal income tax return for 1997. The 1997 tax returns lists Defendant's occupation as "Teacher" and Mr. Gordon's occupation as "Farmer." [7]

Mr. Gordon and Mr. Rhodes blame each other for the misstatements on Defendant's loan application. The Court is persuaded that the loan application was a joint effort of Mr. Gordon and Mr. Rhodes. The Court is persuaded that Mr. Gordon and Mr. Rhodes share responsibility for the misstatements.

Mr. Rhodes sent by facsimile Defendant's loan application to Plaintiff. Plaintiff notified Mr. Rhodes within about twenty minutes that Defendant's loan was approved. Defendant's application would not have been approved if the application had shown the correct information on Defendant's financial condition.

Some two weeks after Defendant's loan was approved, Plaintiff sent certain loan documents to the farm supply store in Rochelle. Defendant authorized Mr. Gordon to sign her name to a promissory note, security agreement, and UCC–1 financing statement. The security agreement gave Plaintiff a security interest in crops. Plaintiff filed the financing statement on March 31, 1998. Mr. Rhodes, at some point, told Defendant that the AgSmart loan "operated as a credit card of sorts." [8]

Several months later, Mr. Rhodes advised Mr. Gordon that he would need additional funds to purchase farm supplies. Mr. Rhodes prepared a second AgSmart Operating Loan Application dated June 29, 1998. Mr. Rhodes copied Defendant's financial information from the first loan application. Mr. Gordon testified that Mr. Rhodes did not ask any questions when the second application was prepared. The second application requested $30,000 to purchase chemicals. Defendant authorized Mr. Gordon to sign her name to the application. Mr. Rhodes sent the application to Plaintiff via facsimile. Plaintiff notified Mr. Rhodes within a few minutes that Defendant's loan application was approved.

Plaintiff sent certain loan documents to the farm supply store. Defendant authorized Mr. Gordon to sign her name to a promissory note, security agreement, and financing statement. The security agreement gave Plaintiff a security interest in crops. Plaintiff filed the financing statement on July 27, 1998.

Defendant testified that, in 1998, her husband did the actual farming, arranged to have the crops sold, managed the farm, purchased the chemicals, and negotiated the farmland lease.[9]

Mr. Gordon and Defendant intended to repay the AgSmart loans from the proceeds of the 1998 cotton crop. The crop failed because of poor weather conditions. Defendant was unable to repay her obligations to Plaintiff. Defendant filed a petition under Chapter 7 of the Bankruptcy Code on July 21, 2000.

---

6. Additional Finding of Fact, Tr. p. 26.

7. Additional Finding of Fact, Plaintiff's Exhibit 13.

8. Additional Finding of Fact, Tr. p. 32.

9. Additional Finding of Fact, Tr. p. 17.

Defendant did not see the loan applications until the first meeting of creditors which was held on August 23, 2000.[10]

Mr. Rhodes testified that he was not an agent for Plaintiff or the AgSmart program.[11]

Plaintiff contends that Defendant's obligations are nondischargeable under section 523(a)(2)(B) of the Bankruptcy Code.[12] This section provides as follows:

### § 523. Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

. . . .

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or

11 U.S.C.A. § 523(a)(2)(B) (West 1993).

The Court, in its memorandum opinion published on June 13, 2001, determined that the first three requirements have been met. The Court determined that Defendant's AgSmart loan application was a materially false written statement regarding Defendant's financial condition upon which Plaintiff reasonably relied. The Court determined that the fourth requirement was not satisfied because Defendant personally lacked the requisite intent to deceive. The district court affirmed these findings.

The district court remanded for this Court to consider whether the fourth requirement, intent to deceive, may be satisfied through agency law. The issue on remand is whether an intent to deceive may be imputed to Defendant through the actions of her husband, Mr. Gordon.

Defendant argues that this Court, in its prior memorandum opinion, did not determine that Mr. Gordon intended to deceive Plaintiff. The facts show that Mr. Gordon signed Defendant's name to a loan application that substantially misrepresented Defendant's financial situation. Defendant and Mr. Gordon had been married for twenty-seven years. Mr. Gordon knew that Defendant's financial information on the loan application was not correct. Mr. Gordon did not object to any of the information that Mr. Rhodes wrote on the loan application. The Court is persuaded that Mr. Gordon knew that Plaintiff would rely on the financial information on the loan application. The Court can only conclude that Mr. Gordon intended to deceive Plaintiff as to Defendant's financial condition.[13]

Courts disagree on the circumstances in which intent to deceive may be imputed

---

10. Additional Finding of Fact, Tr. pp. 29, 129 (Defendant erroneously testified that the first meeting of creditors was held in December of 2000).

11. Additional Finding of Fact, Tr. p. 137–38.

12. 11 U.S.C.A. § 523(a)(2)(B) (West 1993).

13. *See Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 305 (11th Cir.1994) (totality of circumstances, recklessness of behavior, reckless disregard for truth, and sheer magnitude of misrepresentation are factors to consider regarding intent to deceive).

through agency law in a dischargeability of debt proceeding. The district court, in its order on remand, reviewed the various approaches and stated, in part:

## 2. Application of Agency Law

Turning to the second inquiry, this court must determine if the Bankruptcy Court properly considered whether Appellee could be held vicariously liable for the fraudulent intent of an agent so as to preclude discharge of her debt. The Eleventh Circuit has yet to provide clear guidance as to the application of agency principles to § 523(a)(2), although it has noted that it is "bound to a narrow reading of Strang[ v. Bradner, 114 U.S. 555, 5 S.Ct. 1038, 29 L.Ed. 248 (1885)]." In re Villa, 261 F.3d at 1152. A study of the case law in the area reveals some basic trends.

### a. Application of Agency Principles to Business Relationships

Looking first to the application of agency principles to § 523(a)(2) in the context of business relationships, there appears to be little agreement between the Circuits. However, since the Supreme Court holding in Strang, the majority of courts to address the issue in a commercial or business context have held that an innocent debtor's liability for her agent's wrongdoing is nondischargeable under § 523(a)(2) regardless of the debtor's knowledge or participation. See Moore v. Gill (In re Gill), 181 B.R. 666, 673–74 (Bankr.N.D.Ga. 1995) (imputing fraudulent intent among co-partners for purposes of § 523(a)(2)); In re Ledford, 127 B.R. [175] at 184 [(M.D.Tenn.1991)] (imputing a partner's fraudulent intent to his co-partner regardless of the extent of innocent partner's knowledge); Bear, Stearns & Co. v. Powell (In re Powell), 95 B.R. 236, 240 (Bankr.S.D.Fla.1989), aff'd, 914 F.2d

268 (11th Cir.1990) (imputing intent to debtor principle so as to hold debt nondischargeable where agent, a business partner, made materially false misstatements in connection with the purchase of securities); In re Hosking, 89 B.R. [971] at 977 [(Bankr.S.D.Fla.1988)] (holding that under § 523(a)(2) an agent's fraudulent intent was imputable to debtor principle whether or not the debtor knew or should have known of the fraud).

Other courts have held that something more than the mere existence of an agency relationship is required to hold a principle responsible for the fraud of his agent. Specifically, a number of courts have adopted a recklessness standard, requiring that the debtor principle knew or should have known of the agent's fraud in order to impute intent. See Walker v. Citizens State Bank (In re Walker), 726 F.2d 452, 454 (8th Cir. 1984) (per curiam) (holding that an agent's fraud is only imputed to the principle for the purposes of excepting a debt from discharge if the principle knew or should have known of the fraud); Pisano v. Verdon (In re Verdon), 95 B.R. 877, 833[882] (Bankr. N.D.N.Y.1989) (holding that when determining whether a debt is nondischargeable, the existence of an agent-principle relationship, by itself, is insufficient to impute intent from an agent to a debtor principle); Cory v. Futscher (In re Futscher), 58 B.R. 14, 17 (Bankr. S.D.Ohio 1985) (holding that a debt was nondischargeable because debtor principle was recklessly indifferent to her agent's fraudulent acts).

A few courts have ignored the holding in Strang altogether and held that the fraudulent intent of an agent is not imputable to a debtor principle for the purposes of deciding whether a debt should be excepted from discharge.

See, e.g., Alden State Bank v. Anderson (In re Anderson), 29 B.R. 184, 191 (Bankr.N.D.Iowa 1983) (holding that where one partner intentionally submitted a false financial statement that partner's intent to deceive could not be imputed to the innocent partner under § 523(a)(2)(B)).

### b. Application of Agency Principles to the Spousal Relationship

In the marital context, however, courts are consistently more reluctant to impute intent from one spouse to the other so as to prevent discharge of the innocent spouse's debt. One reason courts are hesitant to impute intent is that the marital relationship, by itself, does not always give rise to a legal partnership or agency. See O'Donnel v. Floyd (In re Floyd), 177 B.R. 985, [987]97–88 (Bankr.M.D.Fla.1995) (finding that a husband's fraud would not be imputed to his wife in the absence of specific proof of an agency relationship); In re Ledford, 127 B.R. at 184 (noting that the authorities cited by debtor in opposition to imputing fraud involved spouses, and thus were not decided with regard to agency principles); In re Tara of N. Hills, 116 B.R. 455, 462 (Bankr. E.D.N.C.1989)[(E.D.N.C.1989)], aff'd, 904 F.2d 701 (4th Cir.1990) (holding that a wife is not the agent of her husband strictly by force of the marital relationship); First Sec. Bank v. Steinman (In re Steinman), 61 B.R. 368, 374 (Bankr. W.D.Mo.1986) (holding that the evidence was insufficient to show that wife appointed husband as her agent where, although wife knew husband would be making representations to the bank, she did not assent to the specific misrepresentations or give her husband general authority to act for her in signing the financial statement).

Other courts refuse to impute a spouse's intent, even when the facts suggest that an agency relationship exists. Usually, these court[s] find that intent cannot be imputed because the innocent spouse had little or no involvement in making the false statements. See Landmark Leasing, Inc. v. Martz (In re Martz), 88 B.R. 663, 676 (Bankr.E.D.Pa. 1988) (refusing to impute husband's intent to deceive to wife under § 523(a)(2)(B) where wife had delegated all of her financial dealings to her husband); Leone v. Shane (In re Shane), 80 B.R. 240, 243 (Bankr.S.D.Fla.1987) (holding that fraud committed by husband could not be imputed to wife so as to deny her discharge of debt in the absence of actual or constructive knowledge of the fraud); Chios v. Klein (In re Klein), 58 B.R. 397, 398 (Bankr.E.D.Pa. 1986) (holding a wife's debt dischargeable despite the fact that she signed false loan documents created by her husband because the evidence was insufficient to show that she had knowledge of her husband's fraudulent scheme).

In addition, most courts make a distinction between spouses who are involved in a business or partnership relationship and spouses who are not operating a business, and generally hold that intent will not be imputed from one spouse to the other in the absence of a business relationship. See Allison v. Crescentia (In re Allison), 960 F.2d 481, 485 (5th Cir.1992) (holding that the agency rule under which the fraud of one partner may be imputed to co-partners did not apply to spouses who were not jointly operating a business); First USA, Inc. v. Savage (In re Savage), 176 B.R. 614, 616 (Bankr.M.D.Fla.1994) (noting that in each case where courts have imputed liability from one spouse to the other under § 523(a)(2), both

spouses had a business or partnership relationship independent of the marriage); *S.P. Inv. Ltd. Partnership v. O'Conn[o]r (In re O'Connor),* 145 B.R. 883, 892 (Bankr.W.D.Mich.1992) (refusing to impute spousal intent where husband and wife were not business partners). However, when spouses have a business relationship, courts will usually apply some variety of agency law to impute intent under § 523(a)(2). *See Luce v. First Equip. Leasing Corp. (In re Luce),* 960 F.2d 1277, 1284 n. 10 (5th Cir.1992) (per curiam) (holding that the existence of a marital relationship is irrelevant where a husband's fraud was imputable to his wife under § 523(a)(2) by virtue of their business partnership); *Love v. Smith (In re Smith),* 98 B.R. 423, 426 (Bankr.C.D.Ill.1989) (holding that a husband's fraudulent used-car sale was imputable to wife preventing discharge of debt because dealership license was in wife's name and wife's signature was required on business checks); *W.E. Davis Co. v. Medow (In re Medow),* 26 B.R. 305, 307 (Bankr.S.D.Fla.1982) (finding that although wife may have lacked actual knowledge that her husband submitted a false financial statement on behalf of corporation, she had an intent to deceive under § 523(a)(2)(B) because of her role as corporate secretary).

*Agribank, FCB v. Gordon,* 5:01–CV–374–4 (DF) at 10–14 (M.D.Ga. Sept. 18, 2002).

In *Hoffend v. Villa (In re Villa),*[14] the Eleventh Circuit stated, in part:

> [W]e are mindful of our obligation to construe strictly exceptions to discharge in order to give effect to the fresh start policy of Bankruptcy Code. *See In re*

*Walker,* 48 F.3d 1161, 1164–65 (11th Cir. 1995). Thus, we are bound to a narrow reading of *Strang [v. Bradner,* 114 U.S. 555, 5 S.Ct. 1038, 29 L.Ed. 248 (1885)]. *Strang* imputed liability for fraud in bankruptcy based on the common law of partnership and agency. *See Strang,* 114 U.S. at 561, 5 S.Ct. at 1041.

261 F.3d at 1152.

█ This Court notes that intent to deceive is a fact intensive issue. The facts presented in the following cases are somewhat similar to the case at bar.

In *Equitable Bank v. Miller (In re Miller),*[15] Dr. Miller submitted tax returns and a financial statement which were cosigned by his wife, Janet Miller. Mrs. Miller did not participate in her husband's business beyond signing her name to relevant documents. The Millers were unable to pay their obligations and filed for bankruptcy relief. The creditor contended that the Millers had submitted false financial statements. The Eleventh Circuit stated in part:

> As to Janet Miller, her participation in the Millers' financial matters was extremely minimal, apparently limited to signing her name on relevant co-signatory and co-ownership documents; there therefore is no independent reason contrary to the foregoing analysis to deny her discharge in bankruptcy as to the contested debts. Consequently, for all of the above reasons, we hold that the district court erred in reversing the bankruptcy court's finding that the Millers lacked the requisite intent to deceive under 11 U.S.C. § 523(a)(2)(B).

39 F.3d at 306.

In *W.E. Davis Co. v. Medow (In re*

---

14. 261 F.3d 1148 (11th Cir.2001), *cert. denied,* 535 U.S. 1112, 122 S.Ct. 2328, 153 L.Ed.2d 159 (2002).

15. 39 F.3d 301 (11th Cir.1994).

*Medow)*,[16] the debtor-wife owned stock in and was the secretary of a corporation. The debtor never actively participated in the management or operation of the corporation. The debtor's husband was the chief operating officer. The debtor's husband gave false financial statements to the creditor. The Bankruptcy Court for the Southern District of Florida held that the debtor was also responsible for the false financial statements and stated, in part:

> The debtor takes the position that these financial statements cannot prevent her discharge because they were statements for Weathershield/Nailite furnished by Robert Medow, as chief operating officer. The court finds, however, that Mrs. Medow was fully aware that the purpose of the agreement ultimately made between the parties was to obtain needed capital for the business, and that her signature was required. Under these circumstances her lack of active participation in the daily operation of the business does not discharge her duty of inquiry; a wife cannot avoid responsibility for her actions simply by stating that her husband requested her signature. *Beneficial Consumer Discount Co. v. Barrett, In re Barrett*, 2 B.R. 296 (Bkrtcy.E.D.Pa.1980). Although she may not have had actual knowledge of the errors in the statements, she signed the statements to obtain a benefit. The falsity of the representations will therefore be counted against her, because she may not obtain the benefits and repudiate the responsibilities.

26 B.R. at 307.

In *Love v. Smith (In re Smith)*,[17] the debtor's husband, Bob Smith, was unable to obtain a dealership license to sell automobiles because of his prior felony conviction. The debtor applied for a dealership license in her name and paid the necessary license fee. The debtor indicated on the dealer application that no officer, director, owner, or partner had ever been convicted of a felony. The debtor had sole authority to sign checks. The name of the dealership was Champaign Dealer Marketing. The debtor's husband operated the dealership. The debtor was not involved in the management of the dealership and did not hire or supervise employees.

The dealership agreed to sell Langley's van on a consignment basis. The dealership sold the van to the plaintiffs without telling them that Langley was the true owner and that a creditor held a lien against the van. The debtor's husband used the money from the sale of the van to pay personal obligations. The plaintiffs satisfied the creditor's lien and obtained a judgment against the debtor. The Bankruptcy Court for the Central District of Illinois held that the debtor's obligation to the plaintiffs was nondischargeable and stated, in part:

> Although the testimony indicated that Bob Smith ran the business known as Champaign Dealer Marketing and that Pamela K. Smith did not participate in any of the decision making or management of the business, she did exercise control over Bob Smith because the license was in her name. She was the only person authorized to sign checks, and she actually enabled Bob Smith to operate the business. The Court is convinced that Bob Smith was acting as Pamela K. Smith's agent at the time of the sale of the van to plaintiffs.
>
> Many courts have found that fraud committed by an agent would render a

---

**16.**   26 B.R. 305 (Bankr.S.D.Fla.1982).

**17.**   98 B.R. 423 (Bankr.C.D.Ill.1989).

debt nondischargeable as to a debtor-principal under § 523(a)(2).

A debtor who has not himself made any false representation may be responsible for the fraud of an agent acting within the scope of that agent's authority.

98 B.R. at 426.

In *Walker v. Citizens State Bank of Maryville, Missouri (In re Walker),*[18] the debtor operated a hardware store as a sole proprietor. The debtor became ill and his wife operated the business for two years. The debtor's wife assigned fictitious accounts receivable to the bank. The bank paid for the assigned accounts by directly depositing $43,000 in the hardware store's bank account. The debtor and his wife used the money to pay both business and personal expenses. The debtor did not know about his wife's scheme. The bank discovered the scheme. It was undisputed that the wife was her husband's agent. The Eighth Circuit Court of Appeals stated, in part:

Proof that a debtor's agent obtains money by fraud does not justify the denial of a discharge to the debtor, unless it is accompanied by proof which demonstrates or justifies an inference that the debtor knew or should have known of the fraud. *In re Lovich,* 117 F.2d 612, 614–15 (2d Cir.1941). If the debtor was recklessly indifferent to the acts of his agent, then the fraud may also be attributable to the debtor-principal. *E.g., David v. Annapolis Banking & Trust Co.,* 209 F.2d 343, 344 (4th Cir.1953). In the cases cited to us, the debtors were found to be recklessly indifferent because they had signed false documents without examining them. *Id.; Gardner v. American Century Mortgage Investors,* 577 F.2d 928, 929 (5th Cir.1978); *In re Santos,* 211 F.2d 887, 889 (7th Cir.1954); *In re Savarese,* 209 F. 830, 832 (2d Cir.1913). Despite the debtors' lack of actual knowledge, the courts in those cases refused to discharge the debts because the debtors had no reason, good or bad, for their lack of knowledge. In other words, the debtors in those cases should have known of the fraud. It is clear, however, that failure to read a document prepared by one's agent before signing it is not the only kind of act which can constitute "reckless indifference." The debtor who abstains from all responsibility for his affairs cannot be held innocent for the fraud of his agent if, had he paid minimal attention, he would have been alerted to the fraud. *See In re Savarese,* 209 F. at 832; *David,* 209 F.2d at 344.

Thus, we agree with the district court that more than the mere existence of an agent-principal relationship is required to charge the agent's fraud to the principal. However, as indicated, actual participation in the fraud by the principal is not always required. If the principal either knew or should have known of the agent's fraud, the agent's fraud will be imputed to the debtor-principal. When the principal is recklessly indifferent to his agent's acts, it can be inferred that the principal should have known of the fraud.

Whether a principal knew or should have known of his agent's fraud is, of course, a question of fact.

726 F.2d at 454.

In *Enterprise National Bank of Atlanta v. Jones (In re Jones),*[19] the debtor and Cook agreed to acquire and develop com-

---

18. 726 F.2d 452 (8th Cir.1984).

19. 197 B.R. 949 (Bankr.M.D.Ga.1996) (Walker, J.).

mercial real estate properties. The debtor provided the financial backing, and Cook handled the day-to-day operations. Cook prepared statements that misrepresented the debtor's financial condition. The debtor glanced over and signed the financial statements. Judge Walker of this Court stated, in part:

The final inquiry under section 523(a)(2)(B) is whether Debtor had published the financial statement with the intent to deceive. The Court has already determined that Debtor may not escape the consequences of adopting the financial statement even though another person filled it out. The crux in this issue is whether Debtor possessed the intent to deceive.

. . . .

The Court concludes that Debtor did not act with the intent to deceive the Bank. Debtor's sole source of information regarding the status of his investments valued on his financial statement was Mr. Cook. Debtor had dealt with Mr. Cook for a number of years prior to the events in question, and had not had reason to doubt what Mr. Cook said. While it may not be prudent to rely so heavily upon the honesty of another individual to manage and operate one's investments, mere neglect will not trigger nondischargeability. Such a remedy should not apply to the "careless or presumptuous" debtor, but rather should attach to those debtors who act with "dishonest intent." *Id.* at 305.

197 B.R. at 962–63.

The Court has also considered *Agribank, FCB v. Gordon (In re Gordon)*[20] (hereafter *Effie Lou Gordon*), a decision by Judge Walker of this Court. The Court notes that plaintiff, counsel, the farm store manager, the loan amounts, the last names of the defendants, the dates of the loan applications, and other facts are virtually the same as in the case at bar.

In *Effie Lou Gordon*, the debtor and her husband had operated a family farming operation since 1982. The debtor had no individual income from the previous year. Mr. Rhodes completed AgSmart loan applications after receiving information from the debtor's husband. The debtor did not become personally aware of this information until sometime after the applications were submitted. The findings of fact state "upon learning of the financial information listed on the applications, Debtor did not take any action to correct the errors in the information provided to Plaintiff."[21] Judge Walker found that the debtor had an intent to deceive. Judge Walker stated in part:

In addition to Debtor's reckless indifference, it appears Debtor intended the consequences of her actions. While Debtor allowed her husband to apply for two loans on her behalf and to sign her name to those loan applications, she did not review these applications when they were submitted and had no idea what financial information had been provided to Plaintiff. However, after her husband signed these applications, Debtor became aware of the financial information contained in them. Thereafter, Debtor made no attempt to correct the inaccurate information before completing the loan closing process.

Debtor, in allowing her husband to fill out and sign these applications for her, exhibited reckless indifference. *Massey–Ferguson Credit Corp. v. Archer (In re Archer)*, 55 B.R. 174, 179 (Bankr. M.D.Ga.1985). The failure to inform Plaintiff after hearing about the inaccu-

---

**20.** 277 B.R. 805 (Bankr.M.D.Ga.2001) (Walker, J.).

**21.** 277 B.R. at 808.

rate information indicates that Debtor intended the consequences that resulted. As this Court stated in *Agribank v. O'Steen*[, 2001 WL 1855342 (April 11, Bankr.S.D.Ga.2001)], a knowing renewal of a misrepresentation could lead to the conclusion that a debtor intended to deceive. *Id.* In addition, the reason Debtor applied for these loans was because her husband would not have been approved for the loans had he been the applicant. Further, neither Debtor nor her husband could articulate a sufficient explanation for how the financial information in those loan applications was computed. This demonstrates that Debtor made a knowing, intentional decision to deceive Plaintiff.

277 B.R. at 811–12.

■ Turning to the issue on remand, the Court in its memorandum opinion dated June 13, 2001, held that it was not persuaded that Defendant knew or should have known that her husband would misrepresent her financial condition on the loan applications. Defendant and her husband had been married for twenty-seven years. The Court found that Defendant reasonably believed that her husband knew her financial condition and that he would truthfully report that information on the loan application. Defendant had no reason to question her husband's honesty. 277 B.R. at 805. The district court affirmed these findings.

The Court is not persuaded that intent to defraud may be imputed to Defendant under agency principles either in the context of a business relationship or a spousal relationship. The Court is not persuaded that Defendant and her husband operated the farm as a business partnership. Defendant was a full time teacher who simply helped with chores on the farm. Mr. Gordon did the actual farming, arranged to have the crops sold, managed the farm, purchased the chemicals, and negotiated the farmland lease. Mr. Gordon simply used Defendant's "good credit" to get financing for his farming operations in 1998. The farm operations, prior to 1998, were conducted in Mr. Gordon's name. The farm was operated in Defendant's name in 1998 because Mr. Gordon was in Chapter 11 bankruptcy. Defendant did not know about the false financial information on the loan application until after she filed for bankruptcy relief.

The Court is persuaded that Defendant's obligations to Plaintiff are dischargeable in bankruptcy.

An order in accordance with this memorandum opinion will be entered this date.